# IN THE UNITED STATES DISTRICT COURT

## FOR ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | Case No.: 3:19-mj-00220-MMS |
| Target Devices Seized from 6236 E. 12th Ave., Apt #B3, Anchorage, Alaska, on May 13, 2019, as Further Described in Attachment A | |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, JOLEN GOEDEN, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make and submit this Affidavit in support of an Application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of Target Devices Seized from 6236 E. 12th Ave., Apt #B3, Anchorage, Alaska, on May 13, 2019, as Further Described in Attachment A (hereinafter "Target Devices"). I write this Affidavit based on my personal investigation as well as the reports and statements of other law enforcement officers. I have no reason to believe the information relayed to me by other law enforcement officers is unreliable.

2.      There is probable cause to believe that execution of a search warrant on Target Devices will lead to evidence, fruits, and instrumentalities of violations

MAY 2 2 2019

of prohibited person in possession of a firearm (felon in possession), in violation of 18 U.S.C. § 922(g)(1); drug trafficking, in violation of 21 U.S.C. § 841(a)(1); conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846; and use of a communications facility, in violation of 21 U.S.C. § 843(b), that have been committed, are being committed, and will be committed, including evidence that Target Devices were used in furtherance of these violations. It will also aid in the identification of individuals who are committing these violations.

## AFFIANT BACKGROUND

3.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since April 2004. In this assignment I have investigated a number of violations of United States Code. For the past several years, I have specialized in the investigation of crimes against children including but not limited to internet crimes against children, online enticement of children, child pornography possession and distribution, and commercial sexual exploitation of children. Further, I have conducted and participated in a large number of search warrants, arrest warrants, and interviews of people involved in crimes against children. I am a member of the Alaska Internet Crimes Against Children Task Force and routinely discuss the aspects of investigating these types of cases with other law enforcement and prosecutors. I have also attended trainings specific to the use of computers in the commission of crimes against children.

4.     I have attended several conferences and trainings related to online child exploitation investigations with an emphasis in online investigations

involving the trafficking of child pornography: Innocent Images Online Basic Training Program; Violent Crimes Against Children Forensic Interviewing; and several trainings related to specific programs and applications used in the trafficking of child pornography.

5.     I am also the supervisor for the Violent Crime Squad at the Anchorage FBI Office.  In addition to the crimes against children matters described above, I have also been directly involved in and supervised cases involving the distribution/sale of narcotics and guns, felon in possession cases, threat cases, bank robbery, conspiracy, and a number of other federal violations.

### RELEVANT STATUTES

6.     18 U.S.C. § 922(g)(1) prohibits any person who has been convicted in any court of a crime punishable by a term of imprisonment exceeding one year to ship or transport in interstate or foreign commerce, or to possess in an affecting interstate and foreign commerce, any firearm or ammunition, which has been shipped or transported in interstate or foreign commerce.

7.     21 U.S.C. § 841 prohibits a person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense a controlled substance.

8.     21 U.S.C. § 846 prohibits any attempt of conspiracy to commit any offense defined in 21 U.S.C. § 841, that is, any attempt or conspiracy to knowingly or intentionally manufacturing, distributing, or dispensing, or

MAY 2 2 2019

possessing with intent to manufacture, distribute, or dispense a controlled substance.

9.     21 U.S.C. § 843(b) prohibits the knowing and intentional use of a communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony violation of the drug laws as described in Chapter D of title 21 of the United States Code.

## COMMON PRACTICES OF DRUG TRAFFICKERS AND DRUG TRAFFICKING ORGANIZATIONS

10.     Based on my training and experience, information from confidential informants and other drug investigators, I know that it is common for those involved in drug trafficking to be in possession of firearms due to its violent and lucrative nature.

11.     Based on my training and experience, information from confidential informants and other drug investigators, I know that it is common for those involved in drug trafficking to have large sums of cash in their residence and vehicles, and that such cash constitutes proceeds from drug trafficking. I also know that it is common for drug transactions to be conduct with cash at the street level, between dealers and users.

12.     Based on my training and experience, information from confidential informants and other drug investigators, I know that it is common for those involved in drug trafficking to use wire transfers, money orders, and other financial instruments and services to facilitate drug deals and to send and receive payments

MAY 2 2 2019

for drugs, and that records of these financial instruments and services, such as receipts, bank account numbers, money wire confirmation numbers, wires, and money orders, can be evidence of drug trafficking.

13.     Based on my training and experience, information from confidential informants and other drug investigators, I know that it is common for those involved in drug trafficking to use cell phones and other communication devices to arrange, facilitate, and finalize drug transactions.  I also know that cell phones and other communication devices frequently contain evidence of drug trafficking activity, such as text messages, call records, pictures, and other records.

14.     I know that cell phones are the most common method of communications today.  People use them to make calls, text, and use many other forms of communications that are built into the phones or can be added to the phones by way of different applications or programs.  I know people use these communications to conduct illicit activities and that the phones keep a record of these conversations.  I also know that people use their phones to take pictures of themselves and illicit activities.

15.     Based upon my training, experience and participation in these and other financial/drug trafficking investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

> a. The distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of

illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, such as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. Such records may be found in the form of text messages on cell phones, or emails on targets' computers, tablets, digital cameras or other portable media devices, or smart phones.

b. It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession, sale and distribution of drugs and the collection and transportation of drug proceeds. I also know that the aforementioned records are frequently maintained in the drug

trafficker's residence and sometimes in the traffickers' vehicle(s), computers, tablets, smart phones, digital cameras or other portable media devices.

c. I know that evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves is evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes in their vehicles, businesses, smart phones, tablets, computers or portable media devices.

d. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a conspirator's bank accounts to facilitate the movement of United States currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with handwritten information concerning the intended recipient's name and account number and amounts of money to be deposited. I

MAY 2 2 2019

also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug traffickers and/or nominee depositor's residence, businesses, or vehicles. In addition, drug traffickers can keep such records on their smart phones, tablets, computers, or portable media devices.

e.  It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in drug traffickers' residences or businesses, or in their computers, tablets, smart phones, digital cameras and other portable media devices.

f.  In some instances, the same information or data can be restored/recovered from a forensic examination of a computer as you will find following an examination of portable media devices such as thumb drives, removable hard drives, or even digital cameras. This rationale is true mainly because devices such as thumb drives and

MAY 2 2 2019

removable hard drives are commonly used to save computer internal

hard drive space and the data or information maintained within is more

commonly pulled from a computer to begin with. For instance, while

digital cameras provide the ability to back up documents, records, or

lists upon their own built in media storage space.

## INVESTIGATION AND PROBABLE CAUSE

16. On April 2, 2019, FBI agents received information from an Alaska State Trooper (AST) that, on the evening of April 1 2019, he had conducted a car stop, during which time Minor Victim 1 had been identified as a passenger. The Trooper noted that, at the time of the car stop, Minor Victim 1 did not have any legal identification, and had only four dollars in her possession. Minor Victim 1 also had a backpack in her possession; however, this backpack contained only underwear. Minor Victim 1 was subsequently transported to MYC.

17. On April 18, 2019, and again on April 29, 2019, FBI agents interviewed Minor Victim 1 at MYC. Minor Victim 1 provided the following information:

> a. Minor Victim 1 noted she had been "on the run" for five months, beginning in December or January 2019. While searching for a place to live immediately after running away from home in December or January 2019, Minor Victim 1 reached out to a twenty-



MAY 2 2 2019

one-year-old male named Adam LNU.[1] Minor Victim 1's older sister had dated Adam LNU, which is how Minor Victim 1 had become acquainted with him. Adam LNU responded to Minor Victim 1 on Snapchat, stating that she could live with a group of his friends. Adam LNU sent an adult male named Nick LNU to pick her up and take her to the residence, located at 6236 E 12th Ave, Apt # B3, Anchorage, Alaska. The group living at this residence included Pahua LNU (PH[2]), Davon LNU (PH), Nick LNU (PH), Quanchee LNU (PH), Mark LNU (PH), and Banzo LNU (PH).

b.  Minor Victim 1 was shown a series of photos, sourced by the FBI from the Department of Motor Vehicles (DMV) and public social media (Snapchat) profiles. Minor Victim 1 identified the above referenced individuals as follows: Pahua LNU as Pahoua Chang (DOB 10/05/92); Davon LNU as Davon Lynn Smith (DOB 8/24/92); Nick LNU as Nicola William Mongo (DOB 01/19/99); Quanchee LNU as Doquan Lewis (DOB 09/18/97); Mark LNU as Marcus Andrew Lockett (DOB 8/21/98); and Banzo LNU as Reuben Williams (DOB 1/7/98).

---

[1] LNU indicates when the last name of an individual was unknown by the source.

[2] PH indicates when the phonetic spelling of a name is used because the source did not know the spelling of an individual's name.

MAY 2 2 2019

c. Minor Victim 1 was concerned this group will retaliate against her if they find out she is cooperating with law enforcement. She has heard them, on multiple occasions, describe themselves as part of the Slide Gang and reference their involvement in shootings.

d. Minor Victim 1 has seen multiple handguns at the residence, in the possession of both Mongo and Smith. She noted Smith will often keep his handgun under clothes in his bedroom. She described Mongo's weapon as a handgun with a red/purple handle, and Smith's as a handgun with a green handle.

e. Minor Victim 1 also described being forced to work as a prostitute for Smith, and to being required to provide him with money from those acts of prostitution.

18. During a March 5, 2019, MYC with a seventeen-year-old female (hereinafter "Minor Victim 2"), who is a known victim of sex trafficking, Minor Victim 2 provided the following information:

a. Minor Victim 2 stated that she is fearful to give the FBI information about sex traffickers such as Devan LNU (PH), because it "would get her shot."

b. Minor Victim 2 was shown a photo lineup by the FBI at this time. Minor Victim 2 identified a picture of Davon Lynn Smith (DOB 8/24/92) as Devan LNU. Minor Victim 2 also identified the following associates of Smith, giving their names or nicknames, and

identifying in some cases their relationships with others, as follows: Pahoua Chang aka "Little Mama" as Smith's girlfriend; Marcus Lockett aka "Mark" as Smith's friend; Nicola Mongo aka "Nick" as Smith's friend; and Doquan Lewis aka "Quan or Quanchee" as Smith's friend.

c.  Minor Victim 2 stated that Smith prostitutes girls. Minor Victim 2 has been prostituted by Smith in 2019. Additionally, Minor Victim 2 has witnessed Smith prostitute Minor Victim 1 and a fourteen-year-old female.

d.  Minor Victim 2 noted Smith, Mongo and Lewis all carried guns. Minor Victim 2 stated Mongo owned a red gun, a purple gun, a black gun and a .32 caliber gun, and carried his guns on his person of in his car (described as a silver/gray vehicle). Once, when Minor Victim 2 was in a motel doing dates, Smith, Mongo, and Lewis told her that if anything happened to her they would come and "air out" the motel. Minor Victim 2 stated that "air out" meant shoot up the motel and kill people. Minor Victim 2 later mentioned that Mongo purchased his gun for $200 and there were 10 bodies associated to his gun, which she understood to mean that 10 people had been killed with this gun.

e.  At the conclusion of the interview, Minor Victim 2 expressed her concerns about testifying against these individuals for fear of being

MAY 2 2 2019

shot and killed by them or their associates. She believed they were capable of doing this and expressed that these individuals were associated with a very big gang with ties to the Lower 48.

19.     On May 13, 2019, the FBI executed Federal Search Warrant 3:19-MJ-00207-MMS at 6236 E 12th Ave., Apt. B3, Anchorage, Alaska (hereinafter referred to as "the residence."). The residence is rented and occupied by Pahoua Chang. In addition, Minor Victims 1 and 2 told law enforcement that Davon Lynn Smith, also known as "Drizzy," lived at the residence with Chang. One witness specifically noted that Smith and Chang shared a bedroom at the residence. Smith's address in law enforcement databases is 631 East 22nd Ave., Apt. B1, Anchorage, Alaska.

20.     Davon Lynn Smith was observed by FBI surveillance leaving the subject residence at approximately 2:15pm on May 13, 2019 and walking onto E 12th Ave. As soon as he entered the street, Smith turned around and walked back towards the subject residence. As FBI SWAT prepared to make entry into subject residence, Davon Lynn Smith was again observed walking out of the front door of subject residence onto E 12th Avenue towards a silver BMW, Alaska License Plate JNP205, parked on E 12th Ave. During his approach of this vehicle, but prior to attempting to enter the vehicle, Smith was detained by FBI SWAT and searched. Multiple witnesses described this vehicle as belonging to Smith. FBI SWAT officers searched Smith, and recovered a set of keys. The key ring found on Smith included a BMW car key, a silver Walmart key with the inscription "66," and two

MAY 2 2 2019

Sentry keys with the inscription "302" on each key face. Additionally, $725.00 in cash was found on Smith's person prior to his transport back to the FBI for interview.

21.     During the search of the residence, FBI agents located a Sentry safe in the bedroom described by witnesses as having been occupied by Chang and Smith. FBI agents used one of the Sentry keys from Smith's key ring to open this safe. Inside the safe, FBI agents found two clear-colored bags of suspected heroin, as pictured in the photograph below. This suspected heroin was field tested by FBI agents on May 14, 2019, and both bags tested positive for heroin. Both bags were weighed at the FBI's Evidence Control Center (ECC). One bag weighed 47.3 grams and the other bag weighed 65.6 grams. A scale containing trace amounts of suspected heroin was also found in the bedroom containing the safe.

//

//

//

//

//

//

//

//

//

//



MAY 2 2 2019

A photograph of the opened safe taken during execution of the search warrant is below:



22.     Located in the bedroom closet with the safe were numerous items of male clothing and shoes.

23.     The search warrant authorized the search of the residence for evidence relating to child pornography offenses, and for evidence relating to the sex trafficking of minors and through force, fraud, and coercion. The warrant also authorized search and seizure of electronic devices, including cellular phones, for evidence of the above crimes. Seized during the search were the Target Devices.

24.     Pursuant to the search warrant, law enforcement seized and examined a cell phone belonging to Chang in order to identify evidence relating to child pornography and sex trafficking of minors and through force, fraud, and

MAY 2 2 2019

coercion. Located in plain view on the phone were numerous text messages between Chang, identified as "Lil Mama," and Smith, identified as "Drizzy." In one exchange on March 30, 2019, Chang was upset with Smith and one of his friends because they were not cleaning up after themselves in the residence. As part of the ensuing argument that occurred through text messages, Chang accused Smith of being a heroin dealer on multiple occasions. A copy of the relevant portion of the text exchange follows:

| From | Message |
|------|---------|
| Lil Mama | You don't have a job |
| Lil Mama | Lmao[3] |
| Drizzy | Lmao |
| Lil Mama | Use fake pay stubs |
| Drizzy | u so funny lol |
| Drizzy | i'll always win |
| Lil Mama | Lmao |
| Lil Mama | Heroine seller |
| Drizzy | idk what that is |
| Lil Mama | You tryna play stupid |
| Lil Mama | Because you don't want no cops to read this |
| Lil Mama | It's all good tho |

---

[3] I know from my training and experience that LMAO is an acronym meaning "laughing my ass off."

MAY 2 2 2019

| From | Message |
| --- | --- |
| Lil Mama | Called me a bitch |
| Lil Mama | Youre the bitch too |
| Drizzy | what i'm to smart i don't sell drugs lol |
| Drizzy | what do you do ? |
| Lil Mama | Don't worry |
| Lil Mama | We all know what you do |
| Drizzy | i'm legally imployed |
| Drizzy | nobody but u is saying that lol |
| Lil Mama | By selling illegal drugs ? |
| Drizzy | what do u do again ? |
| Drizzy | where do u work ? |
| Lil Mama | I do nothing |
| Lil Mama | Lmao |
| Drizzy | i forgot lol |
| Drizzy | do u have a paystub ? i got mine .. do u have any ? |
| Lil Mama | You can threaten all you want , you're homeless bitch |
| Drizzy | how do u pay rent at your house? |
| Lil Mama | Go back to your mom |
| Drizzy | i'm confused ? |
| Lil Mama | You're homeless |

MAY 2 2 2019

Case 3:19-mj-00220-MMS   Document 1-1   Filed 05/22/19   Page 17 of 28

| From | Message |
|------|---------|
| Drizzy | lol i got 50 racks lmao[4] |
| Drizzy | i can get a house anytime i want lmao |
| Lil Mama | From selling heroine |
| Lil Mama | Go get a house then |
| Drizzy | Stooooooooooopid |

//

//

//

//

//

//

//

//

//

//

//

//

//

MAY 2 2 2019

---

[4] I know from my training and experience that a rack is slang for $1000.

25.    On April 16, 2018, Chang and Smith exchanged text messages about

Chang picking up after Smith and Smith's belief that Chang had taken money

from a pair of jeans that she had folded and put away for him.  Chang screen

captured those messages and saved them to her phone.  That screen capture is

below:



26.    On April 28, 2019, Chang and Smith exchanged messages about

Chang missing money.  In response, Smith told Chang that she should store her

money in "the safe."  Chang screen captured that exchange.  That message is

below:



20.    Also located during the search were numerous firearms, including a

Tactical Machining .223, a DB .223/.556 multi-caliber rifle, a Remington .380

MAY 2 2 2019

auto loaded with 4 rounds of ammunition, a PMC .380 auto loaded with 26 rounds

of ammunition, 5 40-caliber rounds of ammunition, 19 9mm rounds of

ammunition, a Springfield XD magazine with 11 rounds of assorted ammunition, a

magazine with 30 assorted rounds of ammunition, and a PMAG firearm magazine.

Located in plain view during a search of a phone belonging to Smith for evidence

of child pornography, and sex trafficking or minor and through force, fraud, and

coercion were at least two videos showing Smith in possession of what appears to

be a semi-automatic rifle.

21.     During a statement to law enforcement following the search, Smith

denied living in the residence, but said he stayed there occasionally.   Smith also

denied any knowledge of the safe.

### *Summary of Probable Cause*

42.     I submit that there is sufficient probable cause to believe that

evidence, fruits, and instrumentalities of prohibited person in possession of a

firearm (felon in possession), in violation of 18 U.S.C. § 922(g)(1); drug

trafficking, in violation of 21 U.S.C. § 841(a)(1); conspiracy to commit drug

trafficking, in violation of 21 U.S.C. § 846; and use of a communications facility,

in violation of 21 U.S.C. § 843(b), are present within the Target Devices. I make

this conclusion based on the information contained above, which includes:

> a.  Law enforcement located approximately 100 grams of heroin from a
>
> safe located in the residence, along with a digital scale.

MAY 2 2 2019

b. Law enforcement located multiple guns in the residence, and observed in plain view during a search of one of the Target Devices that is believed to belong to Davon Lynn Smith, aka "Drizzy," a person previously convicted of a felony, at least two videos of him in possession of what appears to be a firearm.

c. As described herein, cellular phones, computers, and other digital devices can be used to communicate with drug suppliers and purchasers, as well as with conspirators. In addition, those devices may contain pictures or videos of drugs, conspirators, or records, or other similar digital records of illegal activity.

43.     Based on my training and experience, all of the information contained in this Affidavit leads me to believe that there is probable cause to believe that located in the Target Devices is evidence, fruits, and instrumentalities of possession of a firearm (felon in possession), in violation of 18 U.S.C. § 922(g)(1); drug trafficking, in violation of 21 U.S.C. § 841(a)(1); conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846; and use of a communications facility, in violation of 21 U.S.C. § 843(b) and (b)(1)(B).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

44.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

MAY 2 2 2019

45. Regarding the Target Devices, there is probable cause to believe that things that were once stored on these devices may still be stored there, for at least the following reasons:

      a. Based on my knowledge, training, and experience, and based upon my communications with law enforcement personnel with specialized technical expertise, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

MAY 2 2 2019

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46. Forensic evidence. As further described herein, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been

MAY 2 2 2019

deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when they were used.

d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an

accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when it was used, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

MAY 2 2 2019

## REQUEST FOR SEALING

49.     This investigation is ongoing.  Furthermore, while Davon Lynn Smith, aka "Drizzy," has been arrested on a federal drug charge, and has made his initial appearance on that charge, the full extent of the investigation is not yet public.  There is reason to believe that notification of the existence of this search warrant and the information contained herein will result in (1) endangering the life or physical safety of an individual; (2) destruction or tampering with evidence; (3) intimidation of potential witness; or (4) otherwise seriously jeopardize the investigation.  Individuals identified in this search warrant, or whose identities can likely be deduced through a careful reading, have expressed concern about their physical safety as a result of their association with Davon Lynn Smith, aka "Drizzy."  If this search warrant is publically-filed, these individuals may find themselves in danger, and may be threatened, harassed, or intimidated.  Furthermore, public filing of the warrant may allow individuals identified herein and as yet unidentified coconspirators to take steps to conceal or tamper with evidence which could jeopardize the investigation.

## WARRANT AND ORDER REQUESTED

50.     In order to obtain evidence, fruits, and instrumentalities of violations of possession of a firearm (felon in possession), in violation of 18 U.S.C. § 922(g)(1); drug trafficking, in violation of 21 U.S.C. § 841(a)(1); conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846; and use of a

MAY 2 2 2019

communications facility, in violation of 21 U.S.C. § 843(b), I seek pursuant to the application accompanying this Affidavit a search warrant for the Target Devices.

51.     I respectfully request that the Court issue a warrant authorizing the FBI and its authorized representatives, including but not limited to other law enforcement agents assisting in the above-described investigation, to search Target Devices in the District of Alaska within 14 calendar days of the issuance of the requested warrant.

JOLENE GOEDEN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
2 2 day of May, 2019

/S/ MATTHEW M. SCOBLE
U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

MATTHEW M. SCOBLE
United States Magistrate Judge
District of Alaska
Anchorage, Alaska





MAY 2 2 2019